**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| GLITCH PRODUCTIONS PTY LTD,<br><br>       Plaintiff,<br> v.<br><br>THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A,"<br><br>       Defendants. | Case No. 25-cv-00161 |

**COMPLAINT**

Plaintiff Glitch Productions Pty Ltd ("Glitch" or "Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

**I. JURISDICTION AND VENUE**

1. This Court has original subject matter jurisdiction over Glitch's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants because Defendants structure their business activities to target consumers in the United States, including Indiana, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Indiana residents by setting up and operating e-commerce stores that target United States consumers; offer shipping to the United States, including Indiana; accept payment in U.S. dollars; and, on information and

1

belief, sell products using infringing and counterfeit versions of Glitch's federally registered trademarks (collectively, the "Unauthorized Products") to residents of Indiana. Each of the Defendants is committing tortious acts in Indiana, is engaging in interstate commerce, and has wrongfully caused Glitch substantial injury in the state of Indiana.

## II. INTRODUCTION

3. Glitch filed this case to prevent e-commerce store operators who trade upon Glitch's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and sell Unauthorized Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate Glitch's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their counterfeiting operation. Glitch is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect consumers from purchasing Unauthorized Products over the Internet. Glitch has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademarks because of Defendants' actions and therefore seeks injunctive and monetary relief.

## III. THE PARTIES

4. Plaintiff, Glitch Productions Pty Ltd, was formed in 2017 and is an Australian web animation studio and entertainment production and distribution company specializing in the development, production, and distribution of entertainment content. Glitch has its principal place of business in Australia.

5. Glitch is an indie animation studio that does it all, from pre-production to post production, marketing to management. Glitch is known for sharing fun and whimsical stories that primarily appeal to teenagers and young adults. While lighthearted, these stories also respect the audience's ability to appreciate mature plots and complex themes. Glitch is also largely recognized for its dedication to creating these stories through 3D animation, an art style not typically associated with traditional animation. By its unique animation style and its approach to storytelling, Glitch has amassed over 8.5 million subscribers to its YouTube channel. Glitch's roster of properties includes famous web series such as Murder Drones, Meta Runner, Sunset Paradise, SMG4, and the subject of this action, The Amazing Digital Circus.

6. *The Amazing Digital Circus*, created by Gooseworx, follows a cast of amnesiac humans that are trapped in digital, toy-like, avatar bodies which inhabit a digital circus. One character, Caine, the supposed ringmaster of the digital world, thinks of random tasks, which seem menial on the surface but end up being life-threatening in the end, for the characters to do. These tasks are designed to stimulate the casts' minds to distract them from the fact that they are forever trapped inside the digital world. Another character, Pomni, the newest addition to the cast, struggles between finding a way to escape and helping her fellow prisoners, who have already given up on the notion, in these dangerous tasks.

7. *The Amazing Digital Circus* is one of Glitch's most popular shows. The pilot episode released on YouTube on October 13, 2023, which has since been watched over 300 million times. Since the release of the pilot, *The Amazing Digital Circus* has amassed a large and dedicated fan base that aims to unravel the mysteries created by the pilot episode. Following the runaway success of the pilot episode, Gooseworx has confirmed that the series will continue. In October of 2024, *The Amazing Digital Circus* also began streaming on Netflix.

8. Glitch markets and sells a variety of products, including plushies, posters, clothing, figurines, keychains, pins, vinyl records, and stickers (collectively, "Glitch Products"). Glitch Products have become enormously popular and even iconic, driven by Glitch's quality standards and innovative designs. Among the purchasing public, Glitch Products are instantly recognizable as such. The Amazing Digital Circus brand has become a global success and Glitch Products are among the most recognizable in the world. Glitch Products are distributed and sold to consumers through Glitch's official website, www.glitchproductions.store.

9. Glitch has continuously used the THE AMAZING DIGITAL CIRCUS and ANIMATEZ trademarks, and other trademarks, and has continuously sold products under its trademarks (collectively, the "Glitch Trademarks"). As a result of this continuous use as well as the fame and popularity of *The Amazing Digital Circus*, strong common law trademark rights have amassed in the Glitch Trademarks. Glitch's use of the marks has also built substantial goodwill in the Glitch Trademarks. The Glitch Trademarks are famous marks and valuable assets of Glitch. Glitch Products typically include at least one of the Glitch Trademarks.

10. The Glitch Trademarks are registered with the United States Patent and Trademark Office, a non-exclusive list of which is included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 7,324,648 | THE AMAZING DIGITAL CIRCUS | Mar. 12, 2024 | For: Clothing, namely, tops, knit shirts, polo shirts, jumpers in the nature of sweaters, T-shirts, sweat shirts, blouses, blazers, sweaters, jackets, vests, coats, ponchos, dresses, skirts, trousers, pants, overalls, jeans, denims in the nature of pants, shorts, camisoles, lingerie, sleepwear, underwear, swim wear, gloves, ties, scarves, headscarves, shawls, Clothing belts of textile, socks, hosiery; footwear; headwear in class 025.<br><br>For: Action figure toys; Toy accessories, namely, costumes for toys; electronic multiple activity toys; modeled plastic figurines being toys; toys, namely, scale model plastic figures; toy models; plush stuffed toys; plush toys; apparatus for electronic games adapted for use with an external display screen or monitor; card games; dice games; arcade games; electronic games for the teaching of children; party games; portable gaming devices, namely, portable games with liquid crystal displays; trading cards for games; dolls; plush dolls in class 028.<br><br>For: Arranging of social entertainment events; entertainment services in the nature of an ongoing animation series; fan club services; live entertainment associated with an animation series, namely cosplay |

| | | | |
|---|---|---|---|
| | | | entertainment events, live music concerts, live visual and audio performances by actors; organization of social entertainment events; providing information, including online, about entertainment activities; provision of entertainment services in the nature of an animation series via an online forum; provision of non-downloadable audio and video entertainment featuring an animation series via electronic or digital transmission; television entertainment, namely, an ongoing television programs in the field of variety; video entertainment services, namely, an animation series; live entertainment production services in the nature of production of live events for parties and special events for social entertainment purposes; production of audio entertainment, namely, audio recording; multimedia entertainment services in the nature of development, production and post-production services in the fields of video and films production of live entertainment; production of animated cartoons; production of audio and/or video recordings, other than advertising; production of webcasts, other than advertising; providing online electronic publications, not downloadable in the nature of magazines in the field of entertainment; On-line journals, namely, blogs featuring entertainment news; Online |

| | | | |
|---|---|---|---|
| | | | publication of journals; screenplay writing in class 041. |
| 7,510,566 | THE AMAZING DIGITAL CIRCUS | Sep. 24, 2024 | For: Articles of imitation jewellery, namely, imitation necklaces and imitation bracelets; Imitation jewellery; Imitation jewellery ornaments, namely, imitation necklaces and imitation bracelets; Pins being jewellery; Decorative pins being jewellery; Decorative pins of precious metal being jewellery; Charms of semi-precious metals for jewellery; Fake jewellery, namely, imitation jewellery and plastic jewellery; Bracelets being jewellery; Clocks; Decorative articles for personal use, namely, jewellery; Decorative ornaments made of plated precious metals, namely, jewellery plated with precious metals; Earrings; Ear studs; Figurines coated with precious metal, namely, medals coated with precious metals; Hat jewellery; Lanyards for holding keys; Necklaces; Key chains comprised of split rings with decorative fobs or trinkets; Key rings comprised of split rings with decorative fobs or trinkets; Key holders being key rings; Charms for key rings; Jewellery rings; Watches in Class 014.<br><br>For: Printed artwork, namely, graphic art prints; Printed posters; Framed posters being framed art prints; Printed advertising posters; Printed publications, namely, books, hand-outs, and workbooks in |

| | | | the field of graphic design; Printed comic books; Printed manga comic books; Printed picture books; Printed story books; Cartoon prints; Printed magazines featuring cartoon characters; Animation cels; Badges made of paper; Lanyards for holding paper cards, namely, lanyards for name badge holders; Printed stickers being stationery stickers; Stationery in Class 016. |
|---|---|---|---|
| 7,324,485 | ANIMATEZ | Mar. 12, 2024 | For: Action figures; scale model kits featuring modeled plastic toy figures; scale toy figure model kits; modeled plastic figurines being toys; toy figures; toy models; plush toys; dolls in class 028. |

11. The U.S. registrations for the Glitch Trademarks are valid, subsisting, and in full force and effect. The registrations for the Glitch Trademarks constitute *prima facie* evidence of their validity and of Glitch's exclusive right to use the Glitch Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the United States Registration Certificates for the Glitch Trademarks are attached hereto as **Exhibit 1**.

12. The Glitch Trademarks are exclusive to Glitch and are displayed extensively on Glitch Products and in marketing and promotional materials. The Glitch Trademarks are also distinctive when applied to Glitch Products, signifying to the purchaser that the products come from Glitch and are manufactured to Glitch's quality standards. Whether Glitch manufactures the products itself or contracts with licensees to do so, Glitch has ensured that products bearing the Glitch Trademarks are manufactured to the highest quality standards.

13. The Glitch Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1) and have been continuously used and never abandoned. The innovative marketing and

product designs of Glitch Products have enabled The Amazing Digital Circus brand to achieve widespread recognition and fame and have made the Glitch Trademarks some of the most well-known marks in the entertainment industry. The widespread fame, outstanding reputation, and significant goodwill associated with The Amazing Digital Circus brand have made the Glitch Trademarks valuable assets of Glitch.

14. The Glitch Trademarks have been the subject of substantial and continuous marketing and promotion by Glitch. Glitch has and continues to market and promote the Glitch Trademarks in the industry and to consumers through the official Glitch website www.glitchproductions.store.

15. Glitch has expended substantial time, money, and other resources in advertising and promoting the Glitch Trademarks. Specifically, Glitch has expended substantial resources in advertising, promoting, and marketing featuring the Glitch Trademarks. Glitch Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs. As a result, products bearing the Glitch Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from Glitch. Glitch Products have become among the most popular of their kind in the world. The Glitch Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with the Glitch Trademarks is of immeasurable value to Glitch.

16. Glitch Products are sold only through authorized retail channels and are recognized by the public as being exclusively associated with The Amazing Digital Circus brand.

17. Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Glitch. On information and belief, Defendants reside and/or

operate in foreign jurisdictions and redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

18. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Glitch to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Glitch will take appropriate steps to amend the Complaint.

### IV. DEFENDANTS' UNLAWFUL CONDUCT

19. The success of The Amazing Digital Circus brand has resulted in significant counterfeiting of the Glitch Trademarks. Because of this, Glitch has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Glitch has identified many fully interactive e-commerce stores offering Unauthorized Products on the online marketplace platform Alibaba Group Holding Ltd. ("Alibaba"), including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 2**).

20. Because counterfeit products sold by offshore online counterfeiters do not enter normal retail distribution channels, the US economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id*. When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of counterfeit products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of counterfeit goods costs the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

21. Online marketplace platforms like the one used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 4**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders." Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 4** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity,

counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186-187. Specifically, brand owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order." *Id*. at p. 161.

22. Defendants have targeted sales to Indiana residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases; offer shipping to the United States, including Indiana; accept payment in U.S. dollars; and, on information and belief, sell Unauthorized Products to residents of Indiana.

23. Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars via numerous methods, including credit cards, Alipay, PayPal, and/or Stripe. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Glitch has not licensed or authorized Defendants to use any of the Glitch Trademarks, and none of the Defendants are authorized retailers of Glitch Products.

24. Many Defendants also deceive unknowing consumers by using the Glitch Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Glitch Products. Other e-commerce stores operating under the Seller Aliases omit using the Glitch Trademarks in the item

title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Glitch Products.

25. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

26. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

27. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

28. E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. Websites like sellerdefense.cn also tip off e-commerce store operators, like Defendants, of new intellectual property infringement lawsuits filed by brand owners, such as Glitch, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

29. Counterfeiters, such as Defendants, typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Glitch's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Glitch.

30. Defendants are working to knowingly and willfully manufacture, import, distribute, offer for sale, and/or sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Glitch, have knowingly and willfully used, and continue to use, the Glitch Trademarks in connection with the advertisement, distribution, offering for sale, and/or sale of Unauthorized Products into the United States and Indiana over the Internet.

31. Defendants' unauthorized use of the Glitch Trademarks in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products into the United States, including Indiana, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming Glitch.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

32. Glitch hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

33. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the Glitch Trademarks in connection with the sale, offering for sale, distribution, and advertising of infringing goods. The Glitch Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Glitch Products offered, sold, or marketed under the Glitch Trademarks.

34. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the Glitch Trademarks without Glitch's permission.

35. Glitch owns the Glitch Trademarks. Glitch's United States registrations for the Glitch Trademarks are in full force and effect. On information and belief, Defendants have knowledge of Glitch's rights in the Glitch Trademarks and are willfully infringing and intentionally using infringing and counterfeit versions of the Glitch Trademarks. Defendants' willful, intentional, and unauthorized use of the Glitch Trademarks is likely to cause, and is causing confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

36. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

37. Glitch has no adequate remedy at law, and if Defendants' actions are not enjoined, Glitch will continue to suffer irreparable harm to its reputation and the goodwill of the Glitch Trademarks.

38. The injuries and damages sustained by Glitch have been directly and proximately caused by Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

39. Glitch hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

40. Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Glitch or the origin, sponsorship, or approval of the Unauthorized Products by Glitch.

41. By using the Glitch Trademarks in connection with the offering for sale and sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

42. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

43. Glitch has no remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of The Amazing Digital Circus brand if Defendants' actions are not enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Glitch prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using the Glitch Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a Glitch Product or is not authorized by Glitch to be sold in connection with the Glitch Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any products as Glitch Products or any other product produced by Glitch, that is not Glitch's or not produced under the authorization, control, or supervision of Glitch and approved by Glitch for sale under the Glitch Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Glitch, or are sponsored by, approved by, or otherwise connected with Glitch;

   d. further infringing the Glitch Trademarks and damaging Glitch's goodwill; and

   e. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Glitch, nor authorized by Glitch to be sold or offered for sale, and which bear any of the Glitch Trademarks;

2) Entry of an Order that, upon Glitch's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms like Alibaba shall

disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Glitch Trademarks;

3) That Defendants account for and pay to Glitch all profits realized by those Defendants by reason of those Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Glitch Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Glitch be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the Glitch Trademarks;

5) That Glitch be awarded its reasonable attorneys' fees and costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 7th day of April 2025.    Respectfully submitted,

/s/ Martin F. Trainor
Martin F. Trainor
TME Law, P.C.
10 S. Riverside Plaza
Suite 875
Chicago, Illinois 60606
708.475.1127
martin@tme-law.com

*Counsel for Plaintiff Glitch Productions Pty Ltd*